# Attachment C

04 CV 8141

JUDGE SWAIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------- x
MICHAEL FEDER, On Behalf of Himself and : Civil Action No.
All Others Similarly Situated,          :
                                        : CLASS ACTION
                    Plaintiff,          :
                                        : COMPLAINT FOR VIOLATION OF THE
        vs.                             : FEDERAL SECURITIES LAWS
                                        :
AMERICAN INTERNATIONAL GROUP,           :
INC., MAURICE GREENBERG, HOWARD         :
SMITH and THOMAS TIZZIO,                :
                                        :
                    Defendants.         : DEMAND FOR JURY TRIAL
--------------------------------------- x

## INTRODUCTION

1. This is a securities fraud class action on behalf of persons who purchased the publicly traded securities of American International Group, Inc. ("AIG" or the "Company") between October 28, 1999 and October 13, 2004 (the "Class Period"), against AIG and its top officers, for violations of the federal securities laws arising out of defendants' dissemination of false and misleading statements concerning the Company's results and operations.

2. AIG is a holding company that, through its subsidiaries, is engaged in a range of insurance and insurance-related activities in the United States and abroad.

3. The true facts which were known by each of the defendants, but concealed from the investing public during the Class Period, were as follows:

(a) That the Company was paying illegal and concealed "contingent commissions" pursuant to illegal "contingent commission agreements;"

(b) That by concealing these "contingent commissions" and such "contingent commission agreements" the defendants violated applicable principles of fiduciary law, subjecting the Company to enormous fines and penalties totaling potentially tens – if not hundreds – of millions of dollars;

(c) That defendants had concealed the fact that it had engaged in illegal transactions using PNC-style structures with at least five additional insurers (in addition to PNC), contrary to defendants' claims on January 30, 2002; and

(d) That as a result of (a)-(c) above, defendants, as more fully described in ¶¶26 - 42, the Company's prior reported revenue and income was grossly overstated.

**Defendants' Scheme Unravels**

4. On October 14, 2004, *CBS MarketWatch* issued an article entitled "Spitzer attacks insurance industry; NY Attorney General sues Marsh over commissions." The article stated in part:

In his latest move in a high profile campaign against corporate wrongdoing, Eliot Spitzer charged several of the nation's largest insurance companies and the largest broker with bid rigging and pay-offs that the New York Attorney General says violate fraud and competition laws.

Spitzer unveiled a law suit Thursday against the world's largest insurance broker, Marsh & McLennan for a common industry practice known as "contingent commissions."

Contingent commissions are paid by insurance companies to reward brokers for sending business their way. Critics claim the payments encourage brokers to sell policies from those insurance companies offering the highest commissions, rather than the ones most suited to their customers.

Two executives from American International Group have pleaded guilty to charges related to the payments, Spitzer said during a televised press conference.

"The prevailing thought within the insurance community was that this investigation would result in minor disclosure changes or a slap on the wrist," said Adam Klauber, an analyst at Cochran, Caronia & Co. "The fact that there are criminal charges suggests that Spitzer thinks parts of this business are really wrong and need changing."

Shares of Marsh, AIG and other leading insurance companies and brokers slumped. Marsh dropped 14 percent to $39.70 and AIG lost nine percent to $60.70.

Ace Ltd., Chubb Corp., Hartford Financial, and Munich Re's Munich American Risk Partners were also involved in the scheme, Spitzer said.

Interestingly, AIG is headed by longtime CEO Hank Greenberg. His sons Evan Greenberg and Jeff Greenberg are the CEOs, respectively, of reinsurer Ace and broker Marsh & McLennan.

Ace spokesman John Herbkersman said the company has received subpoenas from Spitzer as part of the investigation and is cooperating.

"The Hartford is cooperating fully with the New York Attorney."

5. On this news, AIG shares fell $6.80 to $60.19 on unusually heavy trading volume of approximately 50 million shares.

## BACKGROUND AND SUMMARY OF THE ACTION

6. There are basically three types of entities in the insurance market. First, there are clients: companies and individuals seeking to purchase insurance for their businesses, employees or

- 2 -

themselves. Second, there are brokers and independent agents (collectively "brokers"), hired by clients to advise them as to needed coverage and to find insurance companies offering that coverage. Brokers represent the client, obtain price quotes, present the quotes to the client, and make recommendations to the client that include factors other than price, such as differences in coverage, an insurance company's financial security, or an insurance company's reputation for service or claims payment. Third, there are insurance companies. They submit quotes to the brokers and, if selected by the client, enter into a contract to provide insurance for that client's risk.

7.    In this structure, the client makes two types of payments: (1) it pays its broker an advisory fee or a commission for locating the best insurer; and (2) it pays the chosen insurance company premiums for the coverage itself. When the client pays a commission it is usually accomplished in one check to the broker, with the broker deducting the commission and forwarding the premium to the insurance company. Sometimes clients – particularly large commercial clients – break out the broker's fee and pay it directly to the broker.

8.    In addition to the first commission payment described above, brokers sometimes receive another kind of payment, as well, but not one from the clients. These are called "contingent commissions" and come from insurance companies such as AIG pursuant to arrangements generally known as "contingent commission agreements." The precise terms of these agreements vary, but they commonly require the insurance company to pay the broker based on one or more of the following: (1) how much business the broker's clients place with the insurance company; (2) how many of the broker's clients renew policies with the insurance company; and (3) the profitability of the business placed by the broker.

9.    In the late 1990s, Marsh & McLennan ("Marsh"), AIG's key broker began to call these agreements "Placement Service Agreements" or "PSAs." After recent public scrutiny, it has

- 3 -

renamed them "Market Services Agreements" or "MSAs," contending that they do not reflect payment for "a specific transaction or placement" but relate instead to the "services we provide" to insurance companies. Unbeknownst to Marsh's clients, these "services" include steering business to complicit and profiting insurance companies by, among other things, rigging bids and fixing prices.

10.   By way of brief background, during the 1980s and 1990s, the insurance brokerage industry underwent a period of consolidation.

11.   AIG is a publicly traded company with approximately 86,000 employees and over $81 billion in annual revenues. Among its insurance lines is excess insurance which covers losses over and above the amounts covered by the insured's primary insurance policies. Marsh Global Broking's Excess Casualty Group and AIG's American Home Excess Casualty division (AIG's principal provider of commercial umbrella or excess liability and excess worker's compensations insurance) engaged in systematic bid manipulation.

12.   When AIG was the incumbent carrier and a policy was up for renewal, Marsh solicited what was called an "A Quote" from AIG, whereby Marsh provided AIG with a target premium and the policy terms for the quote. If AIG agreed to quote the target provided by Marsh, AIG kept the business, regardless of whether it could have quoted more favorable terms or premium.

13.   In situations where another carrier was the incumbent, Marsh asked AIG for what was variously referred to as a "backup quote," "protective quote" or "B Quote," telling AIG that it would not get the business. In many instances, Marsh provided AIG with a target premium and the policy terms for these quotes. In these cases, it was understood that the target premium set by Marsh was higher than the quote provided by the incumbent, and that AIG should not bid below the Marsh-supplied target.

14.   In other instances, Marsh asked AIG to provide B Quotes where AIG was not supposed to get the business, but Marsh did not set a particular premium target. In these instances,

AIG looked at the expiring policy terms and premium and provided a quote high enough to ensure that (1) the quote would not be a winner, and (2) in the rare case where AIG did get the business, it would make a comfortable profit.

15. In B Quote situations, AIG did not do a complete underwriting analysis. In those few situations when AIG inadvertently won B Quote business (because the incumbent was not able or willing to meet Marsh's target), AIG personnel would "back fill" the underwriting work on the file -- that is, prepare the necessary analysis after the fact.

16. Finally, Marsh came to AIG for a "C Quote" when there was no incumbent carrier to protect. Although Marsh often provided premium targets in these situations, it was understood that there was the possibility of real competition.

### JURISDICTION AND VENUE

17. The claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5. Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa.

18. Venue is proper here pursuant to §27 of the 1934 Act. Acts and transactions giving rise to the violations of law complained of occurred here.

### THE PARTIES

19. Plaintiff Michael Feder purchased AIG publicly traded securities as detailed in the attached Certification and was damaged thereby.

20. Defendant AIG is a holding company that, through its subsidiaries, is engaged in a range of insurance and insurance-related activities in the United States and abroad.

21. AIG operates in the United States. During the Class Period, AIG had approximately 2.61 billion shares of common stock outstanding, which shares traded in an efficient market on the New York Stock Exchange.